Victor L. George, State Bar No. 110504
Wayne C. Smith,  State Bar No. 112535
LAW OFFICES OF VICTOR L. GEORGE
20355 Hawthorne Blvd., First Floor
Torrance, CA 90503
Tel: (310) 698-0990
Fax: (310) 698-0995
E-mail: vgeorge@vgeorgelaw.com
          wsmith@vgeorgelaw.com

Keith D. Nowak
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Tel:  (212) 732-3200
Fax: (212) 732-3232
E-mail: nowak@clm.com

Attorneys for Plaintiff
KANEKA CORPORATION

Robert M. Bowick Jr.
RALEY & BOWICK, LLP
1800 Augusta Drive, Suite 300
Houston, Texas 77057
Tel: (713) 429-8050
Fax: (713) 429-8045
E-mail: rbowick@raleybowick.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

------------------------------------------------------- x

KANEKA CORPORATION, a Japanese
Corporation,

                           Plaintiff,

              -v-

XIAMEN KINGDOMWAY GROUP
COMPANY, a Chinese Corporation, PACIFIC
RAINBOW INTERNATIONAL INC.,  a
California Corporation, MITSUBISHI GAS
CHEMICAL COMPANY, INC., a Japanese
Corporation, MAYPRO INDUSTRIES, INC., a
New York Corporation, and SHENZHOU
BIOLOGY & TECHNOLOGY CO., LTD., a
Chinese Corporation

                           Defendants.

------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**Case No. CV 11-02389 MRP (SSx)**

**KANEKA'S**
**RESPONSIVE BRIEF ON**
**CLAIM CONSTRUCTION**
**UNDER *MARKMAN***

**Date: July 3, 2013**


**Hearing Date:  July 11, 2013**
**Hearing Time: 1:30 p.m.**

**Courtroom 12**

**Judge: Hon. Mariana R. Pfaelzer**

IN ACCORDANCE WITH the expedited *Markman* Scheduling Order dated May 15, 2013 (Doc.No. 98), Plaintiff Kaneka Corporation submits its brief on claim construction in response to Defendants' *Markman* brief (Doc.No. 139 -- filed under seal).

## I.
## KANEKA'S RESPONSE TO DEFENDANTS' *MARKMAN* BRIEF

**A.    "inert gas atmosphere"**

| Kaneka's Construction | Defendants' Construction |
|---|---|
| a gas atmosphere that is less readily reactive with the organic solvent | an atmosphere of inert gas (such as nitrogen, carbon dioxide, helium, argon, or hydrogen) that is free or substantially free of oxygen |

Defendants' interpretation of "inert gas atmosphere" improperly relies upon portions of the specification that describe the process for producing reduced $COQ_{10}$ rather than oxidized $COQ_{10}$. While the specification of Kaneka's '340 patent describes two separate processes for producing reduced $COQ_{10}$ and oxidized $COQ_{10}$[1]; every claim of the '340 patent requires: "[a] process for producing on an industrial scale the oxidized coenzyme $Q_{10}$ ..."[2] There are no claims in Kaneka's '340 patent for the production of reduced coenzyme $Q_{10}$.

---

[1] Doc.No. 132-1, Kaneka's '340 patent, *Abstract*; *Technical Field,* Col. 1, ll. 15-52 ("The present invention relates to a process for producing reduced coenzyme $Q_{10}$ ... and a process for producing the oxidized coenzyme $Q_{10}$ ... More particularly, the present invention relates to a process for producing reduced coenzyme $Q_{10}$ ...); The present invention also relates to a process for producing oxidized coenzyme $Q_{10}$ ..."); *Summary of the Invention,* Col. 3, ll. 33-45 ("It is an object of the present invention to provide a process for producing reduced coenzyme $Q_{10}$ ... It is another object of the present invention to provide a process for producing oxidized coenzyme $Q_{10}$...") (emphasis added)
[2] Doc.No. 132-1, Kaneka's '340 patent, claim 1 preamble (Col. 23, ll. 55-56); claim 11 preamble (Col. 24, ll. 50-51); claim 22 preamble (Col. 25, ll. 31-32); and claim 33 preamble (Col. 26, ll. 13-14) (emphasis added)

The PTO acknowledged these separate processes early in the prosecution, and issued a "restriction and/or election requirement" because the examiner believed that two distinct processes were being simultaneously claimed[3].  The examiner stated:

Restriction to one of the following inventions is required under 35 U.S.C. 121:

I.    Claims 77-102, drawn to a process for producing <u>reduced coenzyme Q10</u>, classified in class 435, subclass 156, for example.

II.   Claims 103-109, drawn to a process for producing <u>oxidized coenzyme Q10</u>, classified in class 435, subclass 156, for example.

<u>The inventions are distinct, each from the other</u> because of the following reasons: <u>Inventions I and II are unrelated.</u>  Inventions are unrelated if it can be shown that they are not disclosed as capable of use together and <u>they have different designs, modes of operation, and effects</u> (MPEP § 802.01 and § 806.06).  In the instant case, <u>the different inventions are directed to two processes that do not share process steps or end points.</u>

Restriction for examination purposes as indicated is proper because all these inventions listed in this action are independent or distinct for the reasons given above ...[4]

Kaneka did not contest the Patent and Trademark Office (PTO) examiner's findings and elected to prosecute solely the patent claims regarding the process for producing <u>oxidized</u> COQ$_{10}$ – *not* <u>reduced</u> COQ$_{10}$:

In the Office Action, restriction is required between Group I (Claims 77-102) and Group II (Claims 103-109).

<u>Applicants hereby elect the subject matter of Group II (Claims 103-109) for prosecution in this application.</u>[5]

---

[3] Compare original claim 77, preamble ("77. A process for producing the <u>reduced coenzyme Q$_{10}$</u> ...") (Doc.No. 132-2 (p. 69 of 125) with original claim 103, preamble ("103. A process for producing the <u>oxidized coenzyme Q$_{10}$</u> ...") (p. 73 of 125) (emphasis added)
[4] Doc.No. 132-3, '340 patent Prosecution File History, (1) PTO's March 22, 2010 Restriction Requirement (KAN 250-256).
[5] Doc.No. 132-3, '340 Patent Prosecution File History, Kaneka's April 19, 2010 Election of Group II (KAN 265)

3

On February 11, 2011, Kaneka filed a divisional patent under 35 U.S.C. § 121 from the '340 patent application to prosecute the non-elected claims for producing <u>reduced</u> $COQ_{10}$.[6] This is <u>not</u> the invention at issue in this case.

Therefore, the portions of the specification relied upon by defendants do not apply. They pertain to production of <u>reduced</u> $COQ_{10}$, not the <u>oxidized</u> $COQ_{10}$ of the '340 patent claims at issue. Defendants attempt to limit the claim to the definition of "deoxygenized atmosphere,"[7] <u>not</u> "inert gas atmosphere." They are two very different things.

Defendants attack Kaneka's use of the relative term "<u>less</u>," in the phrase "less readily reactive." Kaneka's claim interpretation is supported by the testimony of Antonio R. Moreira, Ph.D.[8] It is also found in the ordinary definition of "inert" in bioprocess: "<u>Not readily reactive</u> with other elements; forming <u>few</u> or no chemical compounds."[9] Even the dictionary definition of "inert" uses relative terms.

Kaneka's construction is supported by the specification, which states that "it is <u>not</u> <u>necessary</u> to carry out the recovery of the oxidized Coenzyme $Q_{10}$ under 'the condition that reduced coenzyme $Q_{10}$ is <u>protected from an oxidation reaction</u>.'"[10] Rather, the '340 patent merely states that the recovery of oxidized $COQ_{10}$ may be carried out "in consideration of

---

[6] Ex. 6, Publication No. US 2011/0136191 A1, published June 9, 2011, independent claim's preambles ("1. A <u>process for producing the reduced coenzyme Q10</u> ...")(emphasis added)
[7] Doc.No. 132-1, Kaneka's '340 Patent, Col. 16, lines 35-39 ("<u>a deoxygenized atmosphere</u> (an atmosphere of an inert gas such as nitrogen gas, carbon dioxide gas, helium gas, argon gas or hydrogen gas, reduced pressure, a boiling condition)" (emphasis added).
[8] Doc.No. 132-5, ¶¶47-49
[9] Doc.No. 132-5, p. 55 of 103, Exhibit B (dictionary.com definition of "inert") to the Expert Report of Antonio R. Moreira, Ph.D. (emphasis added)
[10] Doc.No. 132-1, Kaneka's '340 patent, Col. 17, ll. 20-25 (emphasis added).

4

general safe operation and the like"[11] and recognizes that "complete oxygen elimination is very difficult to be achieved . . ."[12]

A person of ordinary skill in the art (POOSITA) would understand that since most organic solvents are combustible,[13] they may pose a safety hazard if exposed to more reactive gases than generally found in the Earth's atmosphere.[14]  Providing an "atmosphere that is less readily reactive with the organic solvent" resolves the possible safety hazard contemplated by the specification.  In order to perform the process safely, the patented extraction process is carried out either in an "inert gas atmosphere" (claims 1-21) or a "sealed tank" (claims 22-45) (discussed below).  The purpose of these elements is to prevent the organic solvent from being exposed to dangerous levels of reactive gases.

In light of the specification, a person of ordinary skill in the art would understand that when producing oxidized $COQ_{10}$, "inert gas atmosphere" does not require the elimination of all (or even substantially all) oxygen.  Kaneka's proposed construction gives effect to the intended purpose of this the claim term, which is merely to carry out extraction in safe manner.  Accordingly, this claim term should be construed to mean "extracting . . . under a gas atmosphere that is less readily reactive with the organic solvent."

**B.** **"sealed tank"**

| Kaneka's Construction | Defendants' Construction |
| --- | --- |
| a tank that substantially prevents direct exposure of its contents to the atmosphere | a tank that is closed to prevent the entry or exit of materials |

---

[11] *Id.*
[12] Doc.No. 132-1, Kaneka's '340 Patent, Col. 10, lines 60-61 (emphasis added).
[13] Doc.No. 132-1, Kaneka's '340 Patent, Col. 10, ll. 50-59 ("As the organic solvent to be used for the extraction, there may be mentioned hydrocarbons, fatty acids esters, ethers, alcohols, fatty acids, ketyones ... hydrocarbons are most preferable.")
[14] Doc.No. 132-5, p. 18 of 103, ¶73 of the Expert Report of Antonio R. Moreira, Ph.D.

1

2      Defendants propose an overly narrow construction that is inconsistent with the claims and

3      specification.  Claims 27-28 and 39-40 require more than simply an extraction occurring in a

4      "sealed tank."  The extraction must <u>also</u> include "continuous extraction" and/or "countercurrent

5      multistage extraction."  <u>This requires materials to flow in and out of the extraction tanks during</u>

6      <u>extraction.</u>  Defendants' construction would prevent this from happening.

7      Kaneka's construction of "extracting . . . in a sealed tank" correctly reflects the

8      understanding of a POOSITA in light of the claims and the intrinsic evidence.  As stated above,

9      the specification expressly states that "<u>it is not necessary to carry out the recovery of oxidized</u>

10     <u>coenzyme $Q_{10}$ under 'the condition that reduced coenzyme $Q_{10}$ is protected from an oxidation</u>

11     <u>reaction,'" but that instead 'the recovery may be carried out in consideration of general safe</u>

12     <u>operation and the like.</u>"[15]  The specification provides three alternatives to alleviate the potential

13     danger of having combustible organic solvents exposed to and reacting with reactive gases – (1)

14     "inert gas atmosphere" (claims 1-21); (2) "sealed tank" (claims 22-45); or (3) both – "sealed tank

15     is sealed under an inert gas atmosphere" (claims 29-30).

16

17     The Honorable Vanessa D. Gilmore, United Stated District Court Judge, considered the

18     very same arguments presented here and interpreted "sealed tank" as "a tank that prevents

19     exposure of its contents to the atmosphere."[16]

20

21      A "sealed tank" is a tank whose contents are not directly exposed to the outside

22     atmosphere.  It need not, and should not, be closed off from other tanks, pipes, or conduits.

23     Indeed, Figure 1 of the patent clearly depicts substances flowing into and out of the tank.  The

24     specification itself is more than sufficient to apprise one of ordinary skill in the art of the

25

26     [15] Doc.No. 132-1, Kaneka's '340 patent, Col. 17, lines 20-25.
       [16] Doc.No. 132-6, *Markman* Order (Aug. 23, 2012), pp. 47 of 64 & 63 of 64)

1   meaning of "sealed tank." If the Court feels more construction is necessary, Kaneka's proposal is

2   consistent with the patent.

3   **C.    "Culturing Reduced Coenzyme $Q_{10}$ Producing Microorganisms … to Obtain**

4   **Microbial Cells Containing Reduced Coenzyme $Q_{10}$ at a Ratio of Not Less than 70**

    **Mole % Among the Entire Coenzyme $Q_{10}$"**

5

| Kaneka's Construction | Defendants' Construction |
|---|---|
| No construction necessary.  Alternatively, culturing (i.e., growing of living cells in a controlled artificial environment)[17] reduced coenzyme $Q_{10}$ (i.e., class of 2,3-Dimethoxy-5-methyl quinones, semiquinones, and quinols with ten isoprene units substituted at the C-6 position)[18], producing microorganisms to obtain microbial cells containing reduced coenzyme $Q_{10}$ at a ratio of not less than 70 mole % among the entire coenzymes Q10 (reduced coenzyme Q10 comprises ≥ 70 mole % of the total coenzyme Q10, i.e., reduced coenzyme Q10 plus oxidized coenzyme Q10). | Culturing reduced coenzyme Q10 producing microorganisms to obtain microbial cells containing reduced coenzyme Q10 at a ratio of not less than 70 mole % among the entire coenzymes Q10 as determined by the assay described at col. 5, line 8 to line 43, and Example 1 of the '340 patent. |

15      Defendants' interpretation attempts to insert into the patent a specific time for sampling

16   the microorganisms in determining the "70 mole %" limitation: "at the end of culturing" [i.e.,

17   fermentation].[19] Defendants asserted this interpretation for the first time in their recent *Markman*

18   brief.  This limitation was not proposed in their prior disclosures, or in the parties' table of

19   respective interpretations above.

20      Nowhere within the claims or specification of Kaneka's '340 patent is there even a

21   suggestion that the "70 mole %" ratio can only be measured from a sample taken at the end of

22   fermentation.   Under defendants' construction, the "70 mole %" limitation could easily be

---

[17] Ex. 5, *McGraw-Hill Concise Encyclopedia of Science & Technology,* 4th Ed. (1998) definition of *Culture* ("A growth of living cells in a controlled artificial environment.")
[18]  Ex. 4, Houston Court *Markman* Order, Doc.No. 93, August 23, 2012, pp. 26 & 62, Construction of "Coenzyme Q10"
[19] Defendants' *Markman* Brief at p. 32.

avoided by simply allowing the microorganisms to remain in the culturing/fermentation tank(s) until mole % of reduced versus total $COQ_{10}$ fell below the claimed minimum 70 mole % ratio. This is because during the culturing process (fermentation), the $COQ_{10}$ producing microorganisms are exposed to oxygen[20] which oxidizes some of the "reduced" $COQ_{10}$ to create "oxidized" $COQ_{10}$. During this process, the reduced $COQ_{10}$ in the total will decrease as the percentage of oxidized $COQ_{10}$ in the total increases. For example, if 15% of the original reduced $COQ_{10}$ is oxidized, the ratio of remaining reduced $COQ_{10}$ (85%) versus the total amount of $COQ_{10}$ would equal 85 mole % (i.e., 100% = 85% reduced COQ10 + 15% oxidized $COQ_{10}$).

When the microorganism food source (a "carbon source, a nitrogen source, a phosphorous source and a micronutrient") is depleted (consumed by the microorganisms), the microorganisms slow down their production of reduced $COQ_{10}$. However, the microorganisms and the reduced $COQ_{10}$ are continually exposed to oxygen through aeration of the culture/fermentation tanks.[21] The longer the microorganisms are left in the fermentation tank after their food supply has been depleted, the mole % ratio of reduced $COQ_{10}$ will fall over time.

By way of analogy, the original reduced $COQ_{10}$ may be compared to a certain amount of ice, and oxidized $COQ_{10}$ to water made from melted ice. The oxygen pumped into the culturing/fermentation tanks is like exposing ice to heat. If 100 pounds of ice was exposed to heat, water will gradually be produced. The percentage of ice will decrease as the percentage of

---

[20] Doc.No. 132-1, Kaneka's '340 patent, Col. 8, lines 58-65 ("The above-mentioned culture is generally carried out aerobically. The term 'aerobically' means a condition that oxygen is supplied so as not to cause oxygen limitation (oxygen deficiency) during the culture, and preferably a condition that oxygen is supplied sufficiently so as not to cause substantial oxygen limitation during the culture. The culture is carried out generally under an aeration condition, preferably under an aeration and stirring condition.")
[21] *Id.*

water increases.  The longer the 100 pounds of ice is exposed to heat, the ratio of remaining ice versus the total amount of original ice falls with time.

Inserting defendants' proposed limitation allows anyone to avoid the patent claims by practicing the inventive process and then simply letting the reduced $COQ_{10}$ continue to oxidize until the ratio of reduced $COQ_{10}$ is less than the requisite 70 mole % threshold.  This is like letting the ice melt before taking the measurement.  Such a construction would defeat the whole inventive concept.

The specification of Kaneka's '340 patent further rebuts defendants' proposed limitation regarding time of sampling.  The *Detailed Description of the Invention* states that the $COQ_{10}$ producing microorganisms are cultured to obtain "reduced $COQ_{10}$" "<u>at first</u>", as follows:

> In the present invention, <u>at first</u>, reduced coenzyme Q10 producing microorganisms are cultured to obtain microbial cells containing reduced coenzyme Q10 at a ratio of not less than 70 mole %, preferably not less than 75 mole %, among the entire coenzymes Q10 (fermentation).[22]

The phrase "<u>at first</u>, reduced coenzyme Q10 producing microorganisms are cultured to obtain ... reduced coenzyme Q10 at a ratio of not less than 70 mole %" <u>does *not* indicate a definite time for measurement</u> as defendants contend.

The fermentation of the culture is complete at <u>any</u> time when the desired amount (> 70 mole %) of reduced $COQ_{10}$ has been produced, as described below:

> **The culture can be completed at the point when a desired amount of reduced coenzyme Q10 is produced.  The culture duration is not particularly limited** and it is generally 20 to 200 hours.[23]

---

[22] Doc.No. 132-1, Kaneka's '340 patent, Col. 4, ll. 40-44 (Detailed Description of the Invention)(emphasis added).
[23] Doc.NO. 132-1, Kaneka's '340 Patent, Col. 8, ll. 54-57 (Detailed Description of the Invention).

9

When following the preferred method of practicing the invention, the manufacturer can stop the fermentation when the desired amount of reduced $COQ_{10}$ has been produced. Whether the manufacturer continues fermentation or lets the microorganisms remain in the fermentation tank after the 70 mole % has been reached is irrelevant.

Defendants also seek to limit the "70 mole %" element to one example of a testing method in the specification. Kaneka's '340 patent claims a process for <u>producing</u> oxidized $COQ_{10}$ – not a method for <u>testing</u> the mole % ratio of reduced versus total $COQ_{10.}$ The process for producing oxidized $COQ_{10}$ should not be limited to any specific method of testing, so long as the testing procedure is accurate and reliable. The specification makes it clear that the disclosed mole % testing method "<u>is *one* method</u> for standardizing the ratio of reduced coenzyme Q10 produced ... so as to reflect the ratio within the range without having significant inaccuracies."[24] It never says it is the *only* method. Defendants contend this language is a clear and unmistakable disclaimer of all other testing techniques. They are plainly wrong about this.

**D.   "oxidizing thus-obtained reduced coenzyme Q10 to oxidized coenzyme Q10" and "oxidizing the extracted reduced coenzyme Q10 to oxidized coenzyme Q10"**

| Kaneka's Construction | Defendants' Construction |
|---|---|
| No construction necessary, i.e., "oxidizing thus obtained reduced coenzyme $Q_{10}$ to oxidized coenzyme $Q_{10}$" and "the extracted reduced coenzyme $Q_{10}$ to oxidized coenzyme $Q_{10}$."[25] Alternatively, increasing the rate at which the reduced coenzyme $Q_{10}$ converts to oxidized coenzyme $Q_{10}$. | Actively converting all or substantially all of the reduced coenzyme $Q_{10}$ obtained from the disruption step to oxidized coenzyme $Q_{10}$ in a step before beginning the extraction step.<br>and<br>Actively converting all or substantially all of the extracted reduced coenzyme $Q_{10}$ to oxidized coenzyme $Q_{10}$ in a separate step after the extraction step has been performed. |

---

[24] Doc.No. 132-1, Doc.No. 132-1, Kaneka's '340 patent, Col. 4, ll. 61-65 (emphasis added).

[25] *See ZMC, Inc. et al. v. Kaneka,* Case No. 4:11-cv-01052, in the Southern District of Texas, Houston Division, Doc.No. 93 (*Markman Order*)

Defendants' interpretation of two oxidizing steps of the '340 patent's inventive process relies primarily upon Kaneka's in-house attorney's notes, in Japanese, about a PTO Examiner interview during the prosecution of the '340 patent.[26]  These notes are the only place where the phrase "active oxidation" ever appears.  The notes are not part of the intrinsic record of the '340 patent, and should have never been produced by Kaneka's former counsel.[27]  According to the intrinsic evidence in the PTO file history the PTO Examiner described the substance of the interview as follows: "Prior art of record has been discussed.  Discussed proposed limitations drawn to 'industrial scale' production."[28]  The PTO Examiner also checked the PTO Interview Summary worksheet to indicate that: "agreement  with  respect  to  the  claims  ☒  was  not reached."[29]

Even if the translation[30] of Kaneka's in-house counsel's notes of the PTO Examiner interview was evidence, these notes indicate that the PTO Examiner actually rejected any attempt to distinguish the claimed invention on the basis of "active oxidation":

Kaneka's Counsel:   At this point, [we] explained that "Isn't it the case that a distinction is made from the prior literature, due to active oxidation by means of an oxidizing agent?"

PTO Examiner:   However, the examiner stated: "In the references, QX [reduced COQ10] is produced on a laboratory level in experiments conducted in an open system, so it can be obtained with oxygen in the air and with an oxidizing agent, so a distinction still cannot be made."[31]

---

[26] See Doc. No. 139, Defendants' Markman Brief at p. 39, lines 17-21 ("Ex. 24 at ZMC107555; Ex. 25)
[27] Kaneka's in-house attorneys' notes would clearly fall within the category of privileged and/or attorney work product materials.
[28] Doc.No. 132-4, '340 patent file history, pp. 59-61 of 128, PTO Interview Summary
[29] Id. at p. 60 of 128 (emphasis added)
[30] Exhibits 24 & 25 to defendants' Markman Brief (Doc.No. 139 – filed under seal)
[31] Exhibit 24 to defendants' Markman Brief (Doc.No. 130 – filed under seal) (ZMC 107556)(emphasis added)

11

Thus, the PTO Examiner rejected any attempted distinction between "active oxidation" by means of an oxidizing agent and oxidation via exposure to atmospheric oxygen. Kaneka's in-house counsel's notes clearly indicate that the PTO Examiner did not rely upon this representation in allowing any claims of the '340 patent. No disclaimer can be based upon this record.

The specification further states that the use of an oxidizing agent is optional: The above-mentioned oxidation *may be carried by*, for example, mixing reduced coenzyme Q$_{10}$ ... with an oxidizing agent (e.g., manganese dioxide or the like).[32]

The specification adds that the oxidation step *can be* performed in *any* of the following manners:

> In the present invention, oxidized coenzyme Q$_{10}$ *can be* produced by oxidizing the above-mentioned microbial cells or disrupted product thereof and then extracting oxidized coenzyme Q$_{10}$ by an organic solvent, or extracting reduced coenzyme Q$_{10}$ from the microbial cells or disrupted product thereof by an organic solvent, purifying optionally and oxidizing the resultant to oxidized coenzyme Q$_{10}$.[33]

The specification makes it clear – there is more than one way to oxidize reduced COQ$_{10}$.

Defendants contend that Kaneka's statements distinguishing its invention from U.S. Patent No. 3,769,170 to Kondo et al.[34] support defendants' construction. Interestingly, in the two volumes of exhibits submitted, defendants did not even bother to *include* the Kondo patent. Kondo discloses a method for producing coenzyme Q$_{10}$ by:

(1)     culturing a COQ$_{10}$ producing microorganism on a nutrient medium containing sources of assimilable carbon and nitrogen, inorganic salts, and

---

[32] Doc.No. 132-1, Kaneka's '340 patent, Col. 17, lines 8-13. (Emphasis added.)
[33] Doc.No. 132-1, Kaneka's '340 patent, Col. 17, lines 1-7.
[34] Exhibit 7.

12

organic nutrients under aerobic cultivation and by fed batch cultivation[35] until intracellular $COQ_{10}$ (oxidized $COQ_{10}$) is produced[36];

    (2)    recovering the oxidized $COQ_{10}$ through one or more centrifuge steps[37];

    (3)    extracting the oxidized $COQ_{10}$ with an organic solvent such as h-hexane[38];

There is no step in Kondo et al. for oxidizing reduced $COQ_{10}$ after disruption ('340 patent claims 1-10 & 22-32) or after extraction ('340 patent claims 11-21 & 33-45). All of the oxidation taught by Kondo et al. occurs during culturing.

Kaneka's '340 patent was distinguished from Kondo because Kondo does not teach oxidation of reduced $COQ_{10}$ after (1) the culturing/fermentation step; (2) the disruption step; or (3) the extraction step. According to the Kondo reference, the entire oxidation of the reduced $COQ_{10}$ occurs during the culturing/fermentation step.

Defendants' proposed construction inserts an "oxidizing all or substantially all" claim limitation that has no basis anywhere in the claims, the specification, or the prosecution history. Here, like elsewhere, defendants are attempting to impose an artificial limitation on claim terms without justification. Defendants' proposed "all or substantially all" concept cannot be found anywhere in the claims.[39] Other than the ratio of reduced $COQ_{10}$ versus the total $COQ_{10}$ (reduced plus oxidized $COQ_{10}$) during the culturing/fermentation step, the specification does not further mention the degree of oxidation. Further, nothing in Kaneka's August 27, 2010 Office Action Response supports defendants' proposed construction. According to defendants' construction, a process for making oxidized $COQ_{10}$ avoids the claims if anything less than 100%

---

[35] Exhibit 7, U.S. Patent No. 3,769,170 to Kondo et al., Col. 2, ll. 18-24.
[36] Exhibit 7, U.S. Patent No. 3,769,170 to Kondo et al., Col. 2, ll. 2-23; Col. 2, ll. 46-54 (Example 1); Col. 6, ll. 23-50
[37] Exhibit 7, U.S. Patent No. 3,769,170 to Kondo et al., Col. 2, ll. 24-25; Col. 2, ll. 55-57 (Example 1); Col. 6, ll. 50-54
[38] Exhibit 7, U.S. Patent No. 3,769,170 to Kondo et al., Col. 2, ll. 63-65 (Example 1).
[39] Doc.No. 132-1, Kaneka's '340 patent, claims 1, 11, 19, 22, 33, 45

("all") or "substantially" 100% of the reduced $COQ_{10}$ is not oxidized.  The Court should not import this groundless limitation into the claims.

Finally, defendants' "separate step" argument introduces ambiguity to the claim language.  One of ordinary skill in the art understands that the claim language does <u>not</u> require a "separate step" limitation.  Defendants attempt to draw a rather inexplicable distinction between "oxidizing *thus-obtained* reduced coenzyme $Q_{10}$ to oxidized coenzyme $Q_{10}$ and *then* extracting the oxidized coenzyme $Q_{10}$" in claims 1 and 22, and "extracting the reduced coenzyme $Q_{10}$ by an organic solvent . . . and oxidizing *the extracted reduced coenzyme $Q_{10}$* to oxidized coenzyme $Q_{10}$" in claims 11 and 33.  Defendants cannot explain why they think the claims require that the <u>oxidation</u> step results in all or substantially all oxidized $COQ_{10}$ <u>prior to</u> the <u>extraction</u> step.  According to defendants, if 0.01% of the reduce $COQ_{10}$ is oxidized during the extraction step, then the process avoids the claims.  The intrinsic record does not support such an interpretation.

The Court should reject defendants' proposed constructions, and, to the extent the Court feels construction is necessary, construe the terms as proposed by Kaneka.

Dated: <u>July 3, 2013</u>                    Respectfully Submitted,

<u>/s/ Victor L. George</u>
<u>/s/Wayne C. Smith</u>
Victor L. George and Wayne C. Smith,
Law Offices of Victor L. George
20355 Hawthorne Blvd., First Floor
Torrance, CA 90503
Tel: (310) 698-0990
Fax: (310) 698-0995
E-mail: vgeorge@vgeorgelaw.com
            wsmith@vgeorgelaw.com


<u>/s/ Keith D. Nowak</u>
Keith D. Nowak, Esq.
CARTER LEDYARD & MILBURN LLP
2 Wall Street

14

New York, NY 10005
Tel:  (212) 732-3200
Fax: (212) 732-3232
E-mail: nowak@clm.com


/s/ Robert M. Bowick Jr.
Robert M. Bowick Jr.
RALEY & BOWICK, LLP
1800 Augusta Drive, STE 300
Houston, Texas 77057
Tel: (713) 429-8050
Fax: (713) 429-8045
E-mail: rbowick@raleybowick.com


*Counsel for Kaneka Corporation*

15

## <u>CERTIFICATE OF SERVICE</u>

It is certified that on the 3rd of July, 2013, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

Lei Mei, Esq.
mei@meimark.com
MEI and MARK LLP
818 18th Street, NW, Suite 410
Washington, DC 20006
Counsel for Xiamen Kingdomway
Group Company and
Pacific Rainbow International Inc.


Timothy P. Walker, Esq.
Timothy.walker@klgates.com
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Counsel for Shenzhou Biology Technology Co. Ltd.


Edward F. Beane, Esq.
ebeane@kblaw.com
KEANE & BEANE, P.C.
445 Hamilton Avenue, 15th. Floor
White Plains, NY 10601
Counsel for Maypro Industries, Inc. and
Maypro Industries, LLC


                                              /s/ Robert M. Bowick Jr.
                                              Robert M. Bowick Jr.