Lei Mei (SBN 240104)
Email: mei@meimark.com
MEI & MARK LLP
P.O. Box 65981
Washington, DC 20035-5981
Telephone: 888-860-5678
Facsimile: 888-706-1173

[Additional counsel listed on signature page]

*Attorneys for Defendants and Counterclaimants*
*Xiamen Kingdomway Group Company and*
*Pacific Rainbow International Inc.*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KANEKA CORPORATION, a Japanese Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ZHEJIANG MEDICINE CO., LTD., a Chinese Corporation, ZMC-USA, L.L.C., a Texas Corporation, XIAMEN KINGDOMWAY GROUP COMPANY, a Chinese Corporation, PACIFIC RAINBOW INTERNATIONAL INC., a California Corporation, MITSUBISHI GAS CHEMICAL COMPANY, INC., a Japanese Corporation, MAYPRO INDUSTRIES, INC., a New York Corporation, SHENZHOU BIOLOGY & TECHNOLOGY CO., LTD., a Chinese Corporation, SOJITZ CORPORATION OF AMERICA, a New York Corporation, and ROCHEM INTERNATIONAL, INC., a New York Corporation,<br><br>Defendants. | Case No. 2:11-cv-02389-SJO (SSx)<br><br>**DEFENDANTS' REPLY TO PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO XKGC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Trial Date: April 3, 2018<br>Courtroom: 10C (1st Street Courthouse)<br><br>Hon. S. James Otero |

Pursuant to this Court's ruling during the pretrial conference held on March 5, 2018, Defendants Xiamen Kingdomway Group Company ("Kingdomway" or "XKGC") and Pacific Rainbow International Inc. (collectively "Defendants") submit this Sur-reply to Plaintiff's Supplemental Brief in Opposition to XKGC's Motion for Summary Judgment ("Plaintiff's Supplemental Brief"). Dkt. No. 770-1. In sum, Defendants respectfully request that this Court strike Dr. Sherman's untimely testing and grant Defendants' Motion for Summary Judgment.

## I.   DR. SHERMAN'S UNTIMELY TESTING PREJUDICES DEFENDANTS

On August 19, 2017, this Court permitted each party "to file a supplemental brief regarding the impact of the Court's February 22, 2017 order [Dkt. No. 696] on Defendants' motion for summary judgment on non-infringement with respect to the '70 mole %' limitation." Dkt. No. 766. The Court ordered "Defendants to file a supplemental brief of not more than three (3) pages on or before September 1, 2017" and ordered "Plaintiff to file an opposition of not more than three (3) pages by September 11, 2017." Dkt. No. 766. There was no indication in the Court's ruling that it expected either party to submit new evidence and new opinions requiring additional discovery.

Rather than provide a three-page brief on the impact of the Court's order, Plaintiff submitted new testing results and new opinions by Dr. Sherman, including a written report by PharmaForensics Laboratories signed by another scientist, Dr. Jeffrey Kittendorf, entitled Evaluation of *Rhodobacter sphaeroides* Viability after Exposure to n-hexane:IPA Mixture. Dkt. Nos. 770-1, 770-4, 770-5, 770-6. The new report included five written pages describing the testing and thirty-six pages of photographs of culture plates. *Id*. Plaintiff submitted these new matters more than ten months after Dr. Sherman provided his report on infringement and more than eight months after Dr. Sherman sat for his deposition.

At a minimum, Defendants would now need to investigate Dr. Sherman's belated testing and opinions through additional discovery, including depositions and

document production. Defendants would also need to ask Dr. Spormann to opine on Dr. Sherman's testing. For example, Dr. Sherman now claims that "[a]fter only fifteen seconds of exposure [to N-hexane] all the bacteria were dead," which directly contradicts his own PharmaForensics Protocol that requires disruption and use of ice. *See* Dkt. No. 696 at 12-16. Therefore, it is simply too late and unfair to ask Defendants to do so, especially with trial approaching on April 3rd, 2018. Dr. Sherman should have and could have provided his opinions and testing results during the normal course of discovery. For at least these reasons, this Court should strike Dr. Sherman's new opinions and preclude Plaintiff from referencing in any way the opinions and testing provided in Plaintiff's Supplemental Brief.

## II. NO REASONABLE JURY COULD FIND THAT KINGDOMWAY'S PROCESS OBTAINS 70 MOLE % REDUCED COENZYME $Q_{10}$ PRIOR TO DISRUPTION

After this Court excluded Dr. Sherman's testing results, Plaintiff pointed to Alliance's 2012 testing as support for its claim. Dkt. 770-1 at 3. There are several problems with Plaintiff's new theory. All of them are fatal to Plaintiff's case.

### A. Dr. Sherman Failed to Opine on Alliance's Testing

Dr. Sherman did not opine on any of Alliance's testing—2012 or 2016—when opining on whether Kingdomway obtained 70 mole %. Dkt. No. 605, Ex. 2, at 121-22. To support his opinion on the old process, Dr. Sherman simply opines, "I believe that the testing of Kingdomway's New CoQ10 plant, utilizing the same coenzyme Q10-producing microorganism, would show the same results had the same microorganisms been cultured in the old plant utilizing substantially similar culture broth and conditions described above." *Id.* at 121. Dr. Sherman later acknowledges that Alliance testing was conducted in 2012 in his opinion on the actual knowledge element of induced infringement. *Id.* at 216. Yet he provides no analysis of the data except to list data values that are above 70 %. Dr. Sherman is therefore precluded from providing opinions on Alliance testing at trial to support Plaintiff's theory that Kingdomway's

process obtains 70 mole % reduced coenzyme $Q_{10}$. Any opinion would be outside the scope of his original opinion.

It is no mystery why Dr. Sherman chose not to analyze the Alliance 2012 results. Plaintiff used a different expert, Dr. Connors, during that phase of the litigation, in the ITC proceeding. The key opinions of Dr. Connors were rejected by the ITC. Dkt. No. 682-1, Ex. B, at 260-62. And Plaintiff's testing was found to be unreliable at the ITC. *Id*. The unreliability of the 2012 testing procedure was the very reason why Dr. Sherman chose to use a mobile laboratory and test the samples on site instead of shipping the samples back to the United States. Dkt. No. 605, Ex. 2, at 43.

For at least the reasons above, it would not only be improper but also unfair for this Court to allow Dr. Sherman to opine on the Alliance 2012 results.

**B.    The 2012 Alliance Testing Shows that Kingdomway Does Not Infringe**

Even if this Court allowed Dr. Sherman to opine on the 2012 results, Dr. Sherman cannot do so in a way that supports Plaintiff's claim. There were three sets of Alliance testing in 2012—March, February, and April. Dkt. No. 605, Ex. 30. As the ITC concluded, all three sets show that Kingdomway does not obtain 70 mole % reduced coenzyme Q10. Dkt. No. 682-1, Ex. B, at 261 ("In contrast with Kaneka's lack of reliable testing data, XKGC has provided three sets of testing data that demonstrate XKGC's process does not meet the 70 mole% limitation.").

Plaintiff now points to the February set of testing as somehow showing 70 mole %. Dkt. No. 770-1 at 4 (referencing Dkt. No. 605, Ex. 30, at 28). But this testing shows exactly the opposite. The only data with values above 70 % were thawed slowly in an oxygen deprived environment, which skewed the results in favor of reduced coenzyme $Q_{10}$. The samples that were thawed quickly resulted in reduced coenzyme $Q_{10}$ that was significantly lower than the ones thawed slowly.

As explained in the Alliance report:

Two additional samples, XKGC-317-02B and -03B were thawed

Defendants' Reply to Plaintiff's Supplemental Brief (Case No. 2:11-cv-02389-SJO (SSx))
3

> quickly using the ultrasonic bath with warm water. These 2 samples defrosted within about 15 minutes and were sampled immediately. The percentage of reduced CoQ10 in these samples were significantly lower than the corresponding Samples XKGC-317-02A and -03A and suggested that the thawing procedure significantly affected the assay.

Dkt. No. 605, Ex. 30, at 23.

Table 1 below identifies the data thawed slowly (shaded) and the data thawed quickly (unshaded).

| | | | | | | |
|---|---|---|---|---|---|---|
| 20120088-02A | A575 | XKGC-317-02A A | 1,248 | 2,447 | 80.1 | 79.3 |
| 20120088-02A | A577 | XKGC-317-02A B | 962 | 2,895 | 72.4 | 71.4 |
| 20120088-02A | A580 | XKGC-317-02A C | 1,183 | 3,206 | 74.5 | 73.5 |
| 20120088-02B | A593 | XKGC-317-02B A | 1,249 | 6,879 | 58.9 | 57.7 |
| 20120088-02B | A594 | XKGC-317-02B B | 1,144 | 6,929 | 56.6 | 55.3 |
| 20120088-02B | A595 | XKGC-317-02B C | 968 | 6,813 | 52.9 | 51.6 |
| 20120088-03A | A578 | XKGC-317-03A A | 2,922 | 4,036 | 85.1 | 84.4 |
| 20120088-03A | A587 | XKGC-317-03A B | 637 | 2,516 | 66.7 | 65.5 |
| 20120088-03A | A588 | XKGC-317-03A C | 1,398 | 3,736 | 74.7 | 73.7 |
| 20120088-03B | A590 | XKGC-317-03B A | 658 | 6,251 | 45.4 | 44.1 |
| 20120088-03B | A591 | XKGC-317-03B B | 580 | 7,616 | 37.6 | 36.4 |
| 20120088-03B | A592 | XKGC-317-03B C | 539 | 6,505 | 39.6 | 38.3 |

Table 1

Dkt. No. 605, Ex. 30, at 28 (excerpt from Table IX of the 2012 Alliance Report).

None of the data above shows values above 70 % when thawed quickly. As one can readily see and as one would expect, slowly thawing the frozen samples in an oxygen deprived environment skews the testing results in favor of an artificially high mole % of reduced coenzyme $Q_{10}$. In other words, Plaintiff now relies on testing results that show how _not_ to test.

The only other values in the 2012 testing that are above 70 % appear in the March testing. Like the February testing, the March testing further shows that Kingdomway does not obtain 70 mole %. The March testing resulted in values of 32.6

%, 33.0 %, and 32.9 % during fermentation. Dkt. 605, Ex. 30, at 15. All values above 70 % occurred after heating. *Id.* Dr. Sherman opined that the disruption process is started by heating. 605, Ex. 2, at 135-36 ("In Kingdomway's old $CoQ_{10}$ plant, the disruption process is started by heating the contents of the 120 $m^3$ fermentation tanks . . . . In Kingdomway's new CoQ10 plant, Kingdomway starts the disruption process by heating the contents of the 160 $m^3$ fermentation tanks . . . ."). The undisputed claim construction of the 70 mole % limitation is that the 70 mole % must be obtained at a time prior to the disruption step. Dkt. No. 155 at 16. This means that none of the values above 70 % in the March testing occurred prior to the disruption step. Thus, Plaintiff cannot use this data to prove the 70 mole % limitation.

## III. <u>CONCLUSION</u>

In conclusion, Plaintiff cannot present any evidence that supports its claim that Kingdomway's process performs the step of culturing a microorganism to obtaining 70 mole % reduce coenzyme $Q_{10}$.

Moreover, Dr. Sherman has not opined in his expert report that the 2012 data, or any of the Alliance data, can be used to prove the 70 mole % limitation. Any such opinions at trial would be outside the scope of his report.

As it did in the ITC proceeding, Plaintiff presented data that is clearly biased in a way that skewed results toward a higher mole % of reduced coenzyme $Q_{10}$. This Court has already found Dr. Sherman's testing to be unreliable, excluding any reference to his testing results to prove the 70 % limitation. Dkt. No. 696 at 16. After having its evidence excluded, Plaintiff improperly submitted new theories and new evidence created by Plaintiff months after expert discovery.

For at least these reasons, this Court should strike Plaintiff's Supplemental Brief, preclude Plaintiff from referring in any way to the opinions and evidence in Plaintiff's Supplemental Brief, and grant Defendants' Motion for Summary Judgment of Noninfringement.

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: March 9, 2018 | **MEI & MARK LLP** |
| 3 | | /s/ Lei Mei |
| 4 | | Lei Mei (SBN 240104) |
| | | Email: mei@meimark.com |
| 5 | | Jeff Pearson (Pro Hac Vice) |
| 6 | | Email: jpearson@meimark.com |
| | | P. Andrew Riley (Pro Hac Vice) |
| 7 | | Email: ariley@meimark.com |
| 8 | | Irene Chen (Pro Hac Vice) |
| | | Email: ichen@meimark.com |
| 9 | | P.O. Box 65981 |
| 10 | | Washington, DC 20035-5981 |
| | | Telephone: 888-860-5678 |
| 11 | | Facsimile: 888-706-1173 |


Dated: March 9, 2018                **MEI & MARK LLP**

/s/ Lei Mei
Lei Mei (SBN 240104)
Email: mei@meimark.com
Jeff Pearson (Pro Hac Vice)
Email: jpearson@meimark.com
P. Andrew Riley (Pro Hac Vice)
Email: ariley@meimark.com
Irene Chen (Pro Hac Vice)
Email: ichen@meimark.com
P.O. Box 65981
Washington, DC 20035-5981
Telephone: 888-860-5678
Facsimile: 888-706-1173

Manni Li (SBN 273984)
Email: mli@meimark.com
MEI & MARK LLP
433 North Camden Drive, Suite 400
Beverly Hills, CA 90210
Telephone: 888-860-5678
Facsimile: 310-564-2769

Xiang Long (SBN 246629)
Email: xlong@metisip-law.com
Xiaobing Zhang (Pro Hac Vice)
Email: xiaobing.zhang@metisip-law.com
METIS IP LAW LLC
1629 K Street NW, Suite 300
Washington DC 20006
Telephone: 202-580-8894

*Attorneys for Defendants and Counterclaimants Xiamen Kingdomway Group Company and Pacific Rainbow International Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing **DEFENDANTS' REPLY TO PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO XKGC'S MOTION FOR SUMMARY JUDGMENT** was filed electronically, and pursuant to Civil L.R. 5-3.2, was served on all interested parties in this action (i.e., served to registered ECF recipients via ECF electronic service) on March 9, 2018.

/s/ Lei Mei
Lei Mei